IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SHARLENE B.,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of Social Security,[1]<br><br>　　　　　　　Defendant. | REPORT AND RECOMMENDATION<br><br><br>Case #4:21-cv-00107-RJS-PK<br><br>District Judge Robert J. Shelby<br>Magistrate Judge Paul Kohler |

　　　　This case is referred to the undersigned from District Judge Robert J. Shelby pursuant to 28 U.S.C. § 636(b)(1)(B). Before the Court is Plaintiff's appeal of the denial of her application for disability insurance benefits. After considering the written briefs, the administrative record, and relevant legal authorities, the Court recommends that the Commissioner's decision be affirmed.

I.　STANDARD OF REVIEW

　　　　This Court's review of the administrative law judge's ("ALJ") decision is limited to determining whether his findings are supported by substantial evidence and whether the correct legal standards were applied.[2] "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[3] The ALJ is required to

---

[1] Pursuant to Fed. R. Civ. P. 25(d) and the last sentence of 42 U.S.C. § 405(g), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

[2] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[3] *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

1

consider all of the evidence, although they are not required to discuss all of the evidence.[4] If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[5] The Court should evaluate the record as a whole, including the evidence before the ALJ that detracts from the weight of the ALJ's decision.[6] However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the Commissioner.[7]

## II.  BACKGROUND

A.   PROCEDURAL HISTORY

In August 2018, Plaintiff filed an application for disability insurance benefits, alleging disability beginning on May 29, 2016.[8] Plaintiff's claim was denied initially and upon reconsideration.[9] Plaintiff then requested a hearing before an ALJ, which was held on May 29, 2020.[10] The ALJ issued a decision on June 24, 2020, finding that Plaintiff was not disabled.[11] The Appeals Council remanded the case for further review.[12] A second hearing was conducted on June 7, 2021.[13] The ALJ again issued an unfavorable decision on June 30, 2021.[14] The

---

[4] *Id.* at 1009–10.
[5] *Richardson*, 402 U.S. at 390.
[6] *Shepherd v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).
[7] *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).
[8] R. at 311–12.
[9] *Id.* at 131, 152.
[10] *Id.* at 66–108.
[11] *Id.* at 153–76.
[12] *Id.* at 177–81.
[13] *Id.* at 47–65.
[14] *Id.* at 12–46.

Appeals Council denied Plaintiff's request for review on September 16, 2021,[15] making the ALJ's decision the Commissioner's final decision for purposes of judicial review.[16]

B.     MEDICAL HISTORY

Plaintiff claimed disability because of bipolar disorder, major depressive disorder, psychogenic seizures, insomnia, vocal cord impairment, and hyperthyroidism.[17] Since the alleged onset date, Plaintiff has been treated for depression and anxiety, and has been diagnosed with bipolar disorder.[18] She has also been seen for a seizure disorder and slurred speech.[19] Additionally, she has a history of insomnia.[20]

In August of 2018, Plaintiff was hospitalized after a suicide attempt.[21] She was diagnosed with major depressive disorder.[22] Blood work revealed evidence of alcohol and benzodiazepines.[23] Plaintiff responded gradually to therapeutic interventions and tolerated medication without adverse side effects.[24] Her suicidal ideation subsided and she was stable for discharge.[25]

---

[15] *Id.* at 1–6.
[16] 20 C.F.R. § 404.981.
[17] R. at 370.
[18] *Id.* at 555, 1185.
[19] *Id.* at 558.
[20] *Id.* at 640.
[21] *Id.* at 784.
[22] *Id.*
[23] *Id.* at 789.
[24] *Id.* at 785.
[25] *Id.*

3

Plaintiff reported that she continued to engage in self-harming behavior in October and November 2018.[26] However, upon examination, she was calm and her affect was appropriate.[27] Additionally, her intellectual functioning was unimpaired, she had adequate insight, her concentration was intact, and no behavioral disturbances were noted.[28]

In December 2018, Plaintiff was seen by consultative psychologist, Mehrnoosh Rezapour, Psy.D.[29] Plaintiff indicated that she lived alone and was able to dress and bathe herself.[30] She was able to participate in light household chores, manage her own money, and could walk and drive to places.[31] Dr. Reazpour noted that Plaintiff's thought process was linear and goal directed, and that she was alert and oriented as to person, place, time, and situation.[32] Dr. Rezapour opined that Plaintiff had mild to moderate limitations in workplace functioning.[33]

Plaintiff was seen multiple times in the emergency room in December 2019 due to withdrawal symptoms and a possible overdose.[34] In January 2020, Plaintiff presented to the emergency room for alcohol addiction and withdrawals.[35] Plaintiff was hospitalized for six days due to suicidal ideation brought on by hyperthyroidism and substance use.[36] By the time she was

---

[26] *Id.* at 817, 845.
[27] *Id.* at 846–47.
[28] *Id.* at 847.
[29] *Id.* at 860–64.
[30] *Id.* at 862.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 863–64.
[34] *Id.* at 1399, 1419.
[35] *Id.* at 1005.
[36] *Id.* at 986, 988.

discharged, her thought process was coherent, and her insight and judgment were both fair.[37] Plaintiff had a positive attitude and her mood was euthymic.[38] After being released, Plaintiff went to a treatment center for about six weeks.[39]

Plaintiff was seen for an accidental overdose of sleeping pills in February 2020.[40] Plaintiff denied any suicidality and stated she was not trying to hurt herself.[41] Plaintiff was discharged that same day and was instructed to control her medications better and follow up with her primary care provider.[42] In March 2020, Plaintiff reported feeling better and denied using alcohol or other problematic substances.[43] Plaintiff "presented as relatively happy, upbeat, and optimistic."[44] However, by April 2020, Plaintiff was drinking heavily again and sought treatment for withdrawals.[45] Plaintiff then entered an inpatient treatment program but checked herself out against medical advice after six days.[46]

In June 2020, Plaintiff was hospitalized after she attempted to enter inpatient treatment and the treatment provider believed that her mental status was not intact.[47] Plaintiff was provided

---

[37] *Id.* at 993.
[38] *Id.*
[39] *Id.* at 1149.
[40] *Id.* at 1293, 1388.
[41] *Id.* at 1388.
[42] *Id.*
[43] *Id.* at 1321.
[44] *Id.*
[45] *Id.* at 1149.
[46] *Id.* at 1376–77.
[47] *Id.* at 1450.

with detoxification treatment.[48] Plaintiff's "mental status was quite impaired for much of her stay," which was likely the result of a thiamine deficiency.[49] By the time she was discharged, however, she was "back to normal."[50]

In July 2020, Plaintiff visited the emergency room after experiencing significant confusion and anxiety.[51] She remained hospitalized for six days due to suicidal ideation.[52] By the time she was discharged, her condition was much improved.[53] Plaintiff was able to attend therapy where she was able to develop a new perspective and new coping strategies.[54] Plaintiff's suicidal ideation had resolved and "she demonstrated greater commitment and executive functioning and judgment to be safe."[55] Later that month, Plaintiff presented to the emergency room complaining of audio and visual hallucinations.[56] But by August 12, 2020, Plaintiff reported that she was doing well.[57]

Plaintiff was again seen in the emergency room in September 2020 after her husband found her unresponsive, possibly due to an overdose.[58] Plaintiff related that she had attempted

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at 1665.
[52] *Id.* at 1871.
[53] *Id.* at 1883.
[54] *Id.*
[55] *Id.* at 1884.
[56] *Id.* at 1661.
[57] *Id.* at 1844.
[58] *Id.* at 1478.

6

suicide the previous week.[59] Plaintiff was given an "inpatient psych admission for safety and stabilization."[60] By the time she was discharged, Plaintiff indicated that she was doing better and felt "fully ready for discharge."[61] It was noted that during her stay, Plaintiff was active in treatment and felt she received significant benefits and developed coping skills.[62] Plaintiff was encouraged to follow up with her treatment providers for therapy and medication management.[63]

In November 2020, Plaintiff was taken to the emergency room by ambulance after threatening suicide.[64] By the time she was discharged, Plaintiff's condition had improved.[65] She denied any active suicidal ideation and demonstrate a positive hope for her future.[66] She exhibited a calm affect and euthymic mood.[67] Plaintiff was instructed to follow up with her treatment provider.[68]

---

[59] *Id.*
[60] *Id.* at 1479.
[61] *Id.* at 1471–72.
[62] *Id.* at 1472.
[63] *Id.* at 1473.
[64] *Id.* at 1627.
[65] *Id.* at 1869.
[66] *Id.*
[67] *Id.* at 1870.
[68] *Id.*

Plaintiff was brought to the emergency room twice in April 2021 because of an altered mental state, possibly due to medication misuse.[69] However, her toxicology screens were negative.[70] Plaintiff denied any suicidal or homicidal ideations and was discharged to home.[71]

C. HEARING TESTIMONY

During the initial hearing, Plaintiff testified that she lived alone, but her estranged husband visited occasionally.[72] She stated that she stopped working due to her mental health, which deteriorated after her grandmother passed away.[73] Plaintiff stated that her mental health issues left her largely bedridden.[74] She indicated that she had no desire to do anything.[75] Plaintiff also stated that she suffered from chronic laryngitis, a sleep disorder, seizures, and back pain.[76] She stated that she did not perform household chores and received help from others.[77]

At the remand hearing, Plaintiff testified that she lived with her father.[78] She stated that her estranged husband comes over every morning to administer her medications.[79] Plaintiff further testified that she receives help doing housework from her mother and sister.[80] She stated

---

[69] *Id.* at 1569, 1582.
[70] *Id.* at 1576, 1589–90.
[71] *Id.* at 1583, 1569–70.
[72] *Id.* at 74.
[73] *Id.* at 81.
[74] *Id.* at 82.
[75] *Id.* at 83.
[76] *Id.* at 83–84, 95–96.
[77] *Id.* at 93–95.
[78] *Id.* at 53.
[79] *Id.* at 55.
[80] *Id.*

that she eats pre-cooked meals and usually goes to the grocery store with her mother.[81] Plaintiff stated that she changes her clothes infrequently and has difficulty sleeping.[82]

D.   THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation process in deciding Plaintiff's claim. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of May 29, 2016.[83] At step two, the ALJ found that Plaintiff suffered from the following severe impairments: major depressive disorder, generalized anxiety disorder, bipolar disorder, mood disorder, alcohol dependence, history of substance abuse, degenerative disc disease, seizure disorder, and obesity.[84] At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.[85] The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain limitations.[86] At step four, the ALJ determined that Plaintiff could not perform her past relevant work.[87] At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform and, therefore, she was not disabled.[88]

---

[81] *Id.* at 56.
[82] *Id.* at 57.
[83] *Id.* at 18.
[84] *Id.*
[85] *Id.* at 18–21.
[86] *Id.* at 21–36.
[87] *Id.* at 36.
[88] *Id.* at 36–38.

III.  DISCUSSION

Plaintiff raises three arguments in her brief: (1) that the ALJ erred in his evaluation of Listing 12.04 for depressive, bipolar, and related disorders; (2) that the ALJ erred in determining that Plaintiff could sustain full-time work despite multiple hospitalization; and (3) that the ALJ erred in evaluating the opinion of Plaintiff's treating psychiatrist, Laura K. Romer, M.D.

A.  LISTING 12.04

At step three, a claimant has the "burden to present evidence establishing her impairments meet or equal listed impairments."[89] In order to satisfy this burden, a claimant must establish that her impairments "meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."[90] "To show that an impairment or combination of impairments meets the requirements of a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment."[91]

Under Listing 12.04, disability is established only if either the "A" and "B" criteria are met or the "A" and "C" criteria are met. The parties' arguments focus on the "C" criteria. The regulations explain that the "C" criteria are used to evaluate mental disorders that are "serious and persistent."

> a. We find a mental disorder to be "serious and persistent" when there is a medically documented history of the existence of the mental disorder in the listing category over a period of at least 2 years, and evidence shows that your disorder satisfies both C1 and C2.

---

[89] *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).

[90] *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

[91] *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007); *see also* 20 C.F.R. § 404.1525.

    b. The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder. . . .
    c. The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.[92]

There is evidence to support a finding that Plaintiff meets the C1 criterion, and the Commissioner does not argue otherwise. Rather, the Commissioner asserts that the ALJ's conclusion that Plaintiff does not meet the C2 criterion is supported by substantial evidence. Plaintiff contends that she meets the C2 criterion because the record supports a finding of marginal adjustment. The ALJ concluded that the evidence failed to establish the presence of the Paragraph "C" criteria. In reaching this conclusion, the ALJ found that the record showed that Plaintiff "can care for herself, she has family members who provide her with support and is able to cope with changes on a daily basis."[93]

---

[92] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(G)(2).
[93] R. at 21.

In support of this finding, the ALJ cited to the functional reports filled out by Plaintiff and her husband.[94] In her report, Plaintiff reported that she rarely changes her clothes, rarely showers, and only leaves the house when absolutely necessary. Plaintiff stated that she relies on her husband to complete household chores. She related that she handles stress poorly, sometimes to the point of self-harm. However, Plaintiff also stated that she could prepare simple meals, go out alone, and was able to drive herself. She also stated that she goes grocery shopping and to pick up her prescriptions. She also indicated that she could pay bills, count change, handle a savings account, and use a checkbook.

Plaintiff's husband similarly stated that Plaintiff often wears the same clothes for several days and that he has to force her to shower. He stated that Plaintiff rarely cooks or performs household chores. Plaintiff's husband further related that Plaintiff rarely leaves the house, does not handle stress well, and has difficulty coping with all aspects of daily life. However, he also noted that Plaintiff could prepare her own meals, go out alone, and drive a car. He also stated that Plaintiff could use the computer, pay bills, count change, handle a savings account, and use a checkbook.

These reports provide support for the ALJ's conclusion that the evidence failed to establish the existence of the Paragraph "C" criteria. While the reports show that Plaintiff suffers from various mental impairments, they do not demonstrate the type of "marginal adjustment" required to meet Listing 12.04. As stated, these reports show that Plaintiff was able to prepare

---

[94] *Id.* at 381–89, 390–97. The ALJ's opinion contains a scrivener's error as to the location in the record of the functional report completed by Plaintiff's husband. While the ALJ cited Exhibit 5E, he appears to have been referring to Exhibit 4E.

meals, go out alone, go grocery shopping, pick up her prescriptions, pay bills, count change, handle a savings account, and use a checkbook. Other evidence demonstrates that Plaintiff was able to live on her own and take care of basic needs.[95] Such activities are not indicative of "marginal adjustment." The ALJ's determination is further supported by the opinions of the consultative examiners, both of whom concluded that the evidence did not establish the presence of the Paragraph "C" criteria.[96] The ALJ found these opinions persuasive, which Plaintiff does not challenge.

Plaintiff faults the ALJ for failing to discuss how her "many episodes of overdose, suicide attempts, self-harm, and hospitalization" factor into the Paragraph "C" evaluation.[97] While the ALJ's Paragraph "C" analysis certainly could have been more robust, the ALJ laid out Plaintiff's medical history in exhaustive detail in other portions of his opinion.[98] Moreover, the fact that the ALJ drew the conclusion that Plaintiff did not meet the Paragraph "C" criteria, despite evidence that might support such a finding, does not warrant reversal.[99] Rather, "the record contains support for both the notion that [Plaintiff] has extreme deficiencies . . . and the

---

[95] *Id.* at 54, 74, 862, 1220, 1243, 1279, 1304, 1787.

[96] *Id.* at 109–30, 132–51.

[97] Docket No. 17, at 13.

[98] *Endriss v. Astrue*, 506 F. App'x 772, 777 (10th Cir. 2012) ("The ALJ set forth a summary of the relevant objective medical evidence earlier in his decision and he is not required to continue to recite the same evidence again in rejecting Dr. Wright's opinion.").

[99] *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted).

notion that [her] . . . limitations are not that severe."[100] In such cases, it is the ALJ, not the Court, who is "entitled to resolve such evidentiary conflicts."[101]

B.    RFC DETERMINATION

Plaintiff next argues that the ALJ erred in his RFC determination. More specifically, Plaintiff argues that the ALJ failed to perform the evaluation required by SSR 13-2p, which sets out a six-part evaluation process for addressing a claimant's drug abuse and alcoholism ("DAA"). The ALJ first considers whether a claimant has DAA. If they do, the ALJ goes on to consider whether the claimant is disabled considering all impairments, including DAA. If the answer to that question is "no," the ruling instructs ALJs to not determine DAA materiality and issue a denial,[102] which is what happened here.

Plaintiff complains that the ALJ did not conduct the entire evaluation process set out in SSR 13-2p. This argument is misplaced. The ALJ found that Plaintiff was not disabled and that the RFC to do light work would remain even considering Plaintiff's DAA. As a result, the ALJ was not required to engage further in the analysis set out in SSR 13-2p.[103] SSR 13-2p makes clear that if the ALJ determines that a claimant is not disabled, the evaluation ends. Therefore, the ALJ was not required to go on. Plaintiff's real argument is that the ALJ should have found Plaintiff disabled at step three, which fails for the reasons set forth above.

---

[100] *Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016).

[101] *Id.*

[102] SSR 13-2p, 2013 WL 621536, at *5–6 (Feb. 20, 2013) ("If the claimant is not disabled, deny the claim.").

[103] *See Sanchez v. Colvin*, No. 2:13-cv-00912-DS, 2014 WL 7010823, at *3 (D. Utah Dec. 12, 2014).

C. MEDICAL OPINION EVIDENCE

Finally, Plaintiff argues that the ALJ erred in his evaluation of Dr. Romer's opinion, Plaintiff's treating psychiatrist. Dr. Romer provided a letter in May 2021,[104] wherein she stated that she had been treating Plaintiff for over a year and any stability that was achieved during that time was short-lived. She opined that Plaintiff's impairments would prevent her from finding and maintaining gainful employment, and recommended Plaintiff's request for disability benefits be approved.

Under the revised regulations, statements that a claimant is unable to work or is disabled are "inherently neither valuable nor persuasive to the issue of whether you are disabled or blind under the Act," and the agency "will not provide any analysis about how we considered such evidence in our determination or decision."[105] Thus, even assuming the ALJ erred in his evaluation of Dr. Romer's opinions, any such errors are necessarily harmless because the ALJ should not have analyzed Dr. Romer's opinion in the first place since it addresses matters reserved to the Commissioner.[106] Remand is not required because the ALJ should have declined to discuss Dr. Romer's opinion.

---

[104] R. at 1867.

[105] 20 C.F.R. § 404.1520b(c).

[106] *See Vachon v. Comm'r of Soc. Sec.*, Case No. 6:20-cv-1521-MRM, 2022 WL 458604, at *11 (M.D. Fla. Feb. 15, 2022) (finding harmless error where an ALJ could have declined to address a medical opinion on an issue reserved to the commissioner); *see also Mary R. v. Kijakazi*, Case No. 2:20-cv-00525-DAO, 2022 WL 656751, at *5 n.5 (D. Utah Mar. 4, 2022) (noting that an ALJ is not required to discuss medical opinions that merely addressed issues reserved for the commissioner).

15

## RECOMMENDATION

For these reasons, the undersigned recommends the ALJ's decision be affirmed.

Copies of this Report and Recommendation are being mailed to all parties who are hereby notified of their right to object. The parties must file any objection to this Report and Recommendation within fourteen (14) days of service. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to object may constitute a waiver of objections upon subsequent review.

DATED July 8, 2022.

BY THE COURT:

PAUL KOHLER
United States Magistrate Judge